IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL ASIBEY OSEI | § | |
| (TDCJ No. 1226413), | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | No. 3:15-cv-2855-L-BN |
| | § | |
| LORIE DAVIS, Director | § | (Consolidated With: |
| Texas Department of Criminal Justice, | § | No. 3:15-cv-3291-L-BF; |
| Correctional Institutions Division,[1] | § | No. 3:15-cv-3292-L-BN) |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Michael Asibey Osei, a Texas inmate, proceeding *pro se*, has filed

three applications for writs of habeas corpus pursuant to 28 U.S.C. § 2254. The Court

has consolidated the related habeas actions. *See* Dkt. No. 9. And, for the reasons

explained below, Osei's applications should be denied.

**Applicable Background**

Osei challenges three state convictions – one for aggravated robbery, resulting

in a 50-year sentence, *see State v. Osei*, F03-48343 (194th Jud. Dist. Ct., Dallas Cty.,

Tex.), and two for aggravated assault, both resulting in 40-year sentences, *see State v.*

*Osei*, F03-48341 & F03-48342 (194th Jud. Dist. Ct., Dallas Cty., Tex.). All three

---

[1] Lorie Davis has succeeded William Stephens as Director of the Texas
Department of Criminal Justice, Correctional Institutions Division, and, as his
successor, she is "automatically substituted as a party." FED. R. CIV. P. 25(d).

convictions and sentences were affirmed in two separate appellate proceedings. *See Osei v. State*, No. 05-03-01428-CR, 2004 WL 1879644 (Tex. App. – Dallas Aug. 24, 2004) (aggravated robbery); *Osei v. State*, Nos. 05-04-00389-CR & 05-04-00390-CR (Tex. App. – Dallas Apr. 22, 2005) (aggravated assaults).

Based on the trial court's conclusion that "counsel failed to timely file petitions for discretionary review in all three cases," the Texas Court of Criminal Appeals (the "CCA") granted Osei leave to file an out-of-time petition for discretionary review ("PDR") as to each conviction and sentence. *Ex parte Osei*, Nos. WR-76,669-01, -02, & -03, 2013 WL 5275917 (Tex. Crim. App. Sept. 18, 2013) (per curiam). The CCA then refused each out-of-time PDR. *See Osei v. State*, PD-1387-13, PD-1388-13, & PD-1389-13 (Tex. Crim. App. Nov. 27, 2013).

The CCA also denied Osei's initial state habeas application as to each conviction and sentence without written order on the findings of the trial court made without a hearing. *See Ex parte Osei*, WR-76,669-07 (Tex. Crim. App. June 11, 2014); *Ex parte Osei*, WR-76,669-08 & -09 (Tex. Crim. App. July 9, 2014). And the pendency of Osei's subsequent state habeas applications tolled the applicable limitations period such that Osei's federal habeas applications are timely filed. *See* 28 U.S.C. § 2244(d)(2); *cf. Mathis v. Thaler*, 616 F.3d 461, 471 (5th Cir. 2010) ("a successive state habeas application [is] 'properly filed' under § 2244(d)(2), even [if it is later] dismissed as an abuse of the writ under Texas law" (discussing *Villegas v. Johnson*, 184 F.3d 467, 468 (5th Cir. 1999))).

The applicable factual background is taken from the Dallas Court of Appeals's

decision affirming Osei's aggravated robbery conviction:

> The following evidence was presented during appellant's aggravated robbery trial. Jamie Reynolds testified she was working in her father's convenience store on the evening of February 5, 2003. For protection, her father kept guns in the store on a shelf below the cash register. Around 9:30 p.m., two dark-complected men wearing blue surgical masks came into the store. The taller of the two men had a shotgun, was wearing black, and demanded that everybody, including two customers, "get down." Fearing that if she "got down" and was not within their sight the robbers might think she was up to something, Jamie remained standing. When she did not comply with his demand, the masked man with the shotgun said, "bitch, didn't you hear me say everybody get down." When Jamie tried to explain why she did not comply, a third man "came out of virtually nowhere." He was wearing a red shirt but no mask, he was lighter in complexion than the other two men, and he was later identified as Badel Smith. Smith came to Jamie's side and demanded, "bitch, didn't you just hear him tell you to get down?" He then fired his gun. Fearing she would be shot, Jamie complied with his demand. From her position on the floor, Jamie could see the robbers' reflections. The shorter masked man joined Smith behind the counter and asked where the safe was. Jamie explained the store no longer had a safe; all the money was now in the cash register. Smith asked how to open the cash register. The robbers joked about Jamie being so scared that she was shaking.

> Two of the men left. The shorter masked man remained in the store and ordered everyone to a back room. As he left, he shut the door. When Jamie heard a shot fired outside and realized the robbers were gone, she ran to the cash register and got a gun. Later that evening, Smith was taken back to the scene of the offense and Jamie identified him as one of the robbers. Although Jamie had never been asked to identify appellant before, at trial she identified him as one of the two masked men. She also recognized him as having been a customer in the store some two weeks earlier. Jamie identified appellant based on his dark complexion, distinctive small eyes, facial structure, and the "nice arch in his eyebrows." Jamie testified that she did not give appellant permission to take either money or property from the store.

> Rodney Allen, who had previously been convicted for both possession and delivery of drugs, witnessed events immediately following the robbery. Allen was sitting in his car in a nearby church parking lot when he saw

police cars in the area. As he was about to leave, he saw one of the squad cars suddenly stop and back up as it neared the store. An officer jumped out of the car and began to run down a trail leading to some apartments. When a man came out of the store, the officer stopped and pursued the man instead. The man was wearing jeans, a gray or white shirt and a jacket. The man ran toward the bus stop with the officer in pursuit. While the officer was holstering his pistol, the man turned and shot at the officer. Although Allen did not see the man fire, he saw fire coming from the man's direction. Allen heard the officer exclaim, "He just shot at me." Allen watched the chase continue until the man stopped and got down on the ground when he was finally cornered by two squad cars. Allen could clearly see the events because the officer was chasing the man toward his car. Allen estimated the chase lasted about ten minutes.

Dallas police officer Darian Loera was on routine patrol in a marked squad car with his partner, Jacob White, on the date of the offense when he saw two black males coming out of a convenience store. One of the men was attempting to hide a shotgun inside his jacket. The other man wore a red shirt. Loera told his partner to stop. Loera got out, identified himself as a police officer and told the men to stop. They didn't. Instead, they ran toward the back of the store and kept running. As Loera was running after the two men, he saw a third man, later identified as appellant, come out of the store. Loera identified himself and told appellant to stop. Instead, appellant ran. Loera chased him holding a gun in his right hand and a flashlight in his left hand. Loera could not see that appellant had a gun because appellant's back was to him. As Loera was holstering his gun, he looked up and saw appellant fire a pistol at him from about fifteen yards away. Appellant was in the light when he turned to fire at Loera. The police later recovered a casing from near the front of the bus stop. When appellant fired, his arm was fully extended and pointed at Loera; appellant was not trying to put the pistol in his pocket. Loera did not return fire out of concern for surrounding residences and innocent bystanders. Loera continued to chase appellant. When appellant ran into a church parking lot, Loera momentarily lost sight of him. Appellant was wearing a leather jacket, a white T-shirt and no mask, but Loera never saw appellant's face. Loera later heard a "robbery in progress" call over the police radio, so he went to the convenience store to see if there might still be other robbers inside. There, Jamie told him she had been robbed but all the robbers had left. Loera denied threatening appellant with filing an aggravated assault on a police officer or capital murder charge on him if he did not identify the other two men.

In the meantime, another two officers arrived, Officers John Sanchez and

Mario Gomez. Gomez joined in the foot chase and Sanchez joined White in the automobile chase. Sanchez and White ultimately cornered appellant with their squad cars and appellant surrendered.

A canine officer and his dog engaged in a foot chase with one of the other suspects. That chase led to an apartment in the Carpenter Cove Apartments. By the time Loera got to the apartment, the suspects were gone, having broken a bedroom window to escape. The apartment was searched and certain items of evidence were retrieved, including a jacket with Snickers candy bars in the pocket (stolen from the convenience store), a mask, and a shotgun. Appellant's car was parked on the street near the apartments where the evidence was recovered.

Dallas police officer Jacob White was Loera's partner on the night of the offense and was driving the squad car when Loera told him to stop. He stopped and Loera got out and ordered the suspects to stop. When they did not stop, White requested additional officers on the scene. He saw appellant run down the street, turn, and fire at Loera. White saw a "muzzle flash" about four or five feet off the ground. White drove around setting up a perimeter. Because of a barrier, White could not follow appellant through the church parking lot. As White was following appellant in the squad car, at one point he saw him gesture as if he were throwing something over the fence. Sanchez, who had arrived on the scene within about a minute and joined in the automobile chase, cornered appellant with his squad car; White and Sanchez arrested appellant without a struggle. No weapons were found on appellant. On the way back to the store, White found a pistol in the street.

When appellant was booked into jail, he said he lived in Garland, a city approximately nineteen miles from the location of the offense. Smith was arrested about one-half mile away from the scene of the offense and Jamie identified him at the scene as one of the robbers. The third suspect with the shotgun had not been arrested at the time of trial.

Dallas police officer John Sanchez testified when he and Gomez arrived, Loera told him a suspect had fired at him. Gomez got out and assisted in the foot chase. Sanchez and White arrested appellant. When Sanchez drove up, appellant stopped, put his hands up, and complied with the officer's demands to get on the ground. Appellant also cooperated in giving them personal information. Sanchez found a blue mask in the alley.

Dallas police officer Marshall McLemore was the officer who transported

-5-

appellant to the police station. Appellant was placed in the front passenger seat of his squad car. As McLemore was driving back to the store, appellant volunteered that his car was parked on the street near the Carpenter Cove Apartments and asked the officer to check to see if the other suspects had taken it. The car, which was registered in appellant's name, was found on the street near the apartments.

Dallas police officer Dan Krieter was assigned to the crime scene response unit and processed and photographed the scene of the robbery. Krieter was able to lift fingerprints from some items but they were not appellant's prints. He did not attempt to retrieve fingerprints from the gun or casing because they had been out in the rain. Krieter recovered a 9mm pistol with one live round in the chamber and nine live rounds in the magazine, a 12-gauge shotgun loaded with three shells, a blue mask from the alley, a Swisher Sweets box, a Phillies Blunt box, and a red cap. He also recovered some bullet fragments near the cash register.

Heather Thomas, a firearms expert from the Southwestern Institute of Forensic Sciences (SWIFS), testified she tested certain evidence in the case. She determined the two fired casings were fired from the 9mm pistol. She also performed a "drop test" on the gun and was unable to get it to fire accidentally. She determined that the gun would only fire by pulling the trigger with a pressure of nine-and-a-half to ten pounds. Thomas did not examine the gun to see if it had been fired prior to her testing it nor did she make any notes about any residue on the barrel.

*Osei*, 2004 WL 1879644, at *1-*4.

Osei now claims, as to both aggravated assault convictions and as to the aggravated robbery conviction, that the trial court lacked jurisdiction and that his trial counsel were constitutionally ineffective. As to the assault convictions, he further claims that the evidence was factually and legally insufficient to show that the gun was fired intentionally. And, as to the robbery conviction, he also claims that the evidence was factually insufficient to identify him as one of the robbers.

## Legal Standards

Where a state court has already rejected a claim on the merits, a federal court

may grant habeas relief on that claim only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court adjudication on direct appeal is due the same deference under Section 2254(d) as an adjudication in a state post-conviction proceeding. *See, e.g.*, *Dowthitt v. Johnson*, 230 F.3d 733, 756-57 (5th Cir. 2000) (a finding made by the CCA on direct appeal was an "issue ... adjudicated on the merits in state proceedings," to be "examine[d] ... with the deference demanded by [the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA")]" under "28 U.S.C. § 2254(d)").

A state court decision is "contrary" to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby*, 359 F.3d at 713; *see also Lopez v. Smith*, 574 U.S. ___, 135 S. Ct. 1, 2 (2014) (per curiam) ("We have emphasized, time and time again, that the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" (citation omitted)).

A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.... A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations and internal quotation marks omitted). "Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102 (internal quotation marks omitted).

The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 101 (internal quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. The Supreme Court has explained that, "[i]f this standard is difficult to meet, that is because it was meant to be," where, "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," but "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," and "[i]t goes no further." *Id.* Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must

show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *accord Burt v. Titlow*, 571 U.S. ___, 134 S. Ct. 10, 16 (2013) ("If this standard is difficult to meet – and it is – that is because it was meant to be. We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunctio[n] for which federal habeas relief is the remedy." (internal quotation marks and citations omitted)).

As to Section 2254(d)(2)'s requirement that a petitioner show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the Supreme Court has explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" and that federal habeas relief is precluded even where the state court's factual determination is debatable. *Wood v. Allen*, 558 U.S. 290, 301, 303 (2010). Under this standard, "it is not enough to show that a state court's decision was incorrect or erroneous. Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder must conclude that the state court's determination of the facts was unreasonable." *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

The Court must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s]

the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). This presumption applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *see also Harrington*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) ("a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc))).

In sum, Section 2254 creates a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). To overcome this standard, a petitioner must show that "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

## Analysis

<u>Trial-court-jurisdiction claims</u>

This Court cannot consider Osei's contention that the State lacked jurisdiction to prosecute him because "the State failed to put forth evidence of some sort of contract that gives interest or right of Osei to the State," Dkt. No. 1 at 12, as such a contention, although facially dubious, is nonetheless not cognizable under Section 2254.

"The sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994) (citing *Branch v. Estelle*, 631 F.2d 1229 (5th Cir. 1980)); *accord Alexander v. McCotter*, 775 F.2d 595, 598 (1985).

> For an indictment to be "fatally defective," no circumstances can exist under which a valid conviction could result from facts provable under the indictment. *Morlett v. Lynaugh*, 851 F.2d 1521, 1523 (5th Cir. 1988).
>
> State law determines whether an indictment is sufficient to vest jurisdiction in the state trial court. *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994). Under Texas law, "indictments charging a person with committing an offense, once presented, invoke the jurisdiction of the trial court and jurisdiction is no longer contingent on whether the indictment contains defects of form or substance." *Teal v. State*, 230 S.W.3d 172, 177 (Tex. Crim. App. 2007). [Even the] "failure to allege an element of an offense in an indictment or information is a defect of substance," as opposed to one of jurisdiction. *Studer v. State*, 799 S.W.2d 263, 268 (Tex. Crim. App. 1990). As acknowledged in *Studer*, if omitting an element from an indictment is a defect of substance in an indictment, it naturally follows that the indictment is still an indictment despite the omission of that element. *Id.*

*Fields v. Thaler*, Civ. A. No. H-11-0515, 2012 WL 176440, at *6-*7 (S.D. Tex. Jan. 20, 2012).

Osei has not shown that the state indictments were "so defective" as to deprive each "state court of jurisdiction," *McKay*, 12 F.3d at 68, and, moreover, because the CCA denied his state habeas applications without a written order, the highest state court has indicated "that the indictment[s are] sufficient, so [Osei's] claim[s are] thus not cognizable under § 2254," *Odham v. Scott*, 56 F.3d 1384, 1995 WL 337647, at *2 (5th Cir. 1995) (per curiam) (citing *Alexander*, 775 F.2d at 599; *McKay*, 12 F.3d at 68).

-11-

Sufficiency-of-the-evidence claims

      To the extent that Osei presses a factual-sufficiency-of-the-evidence claim as to

each state conviction,

> such a claim is not cognizable on federal habeas review.

> > The factual sufficiency test is rooted in the Texas
> > Constitution, and at one time, was followed by the Texas
> > courts in reviewing the elements of an offense on appeal.
> > *Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002), citing
> > *Clewis[ v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)].
> > The test requires more scrutiny than the federal
> > constitutional standard set forth in *Jackson v. Virginia*[, 443
> > U.S. 307 (1979)]. *Id.* at 357-58. Federal courts do not apply
> > the *Clewis* standard, which is based on Texas state law, in
> > federal habeas review. *Woods*, at 358. Moreover, the Texas
> > Court of Criminal Appeals has overruled the factual
> > sufficiency standard of *Clewis* and has held that the legal
> > sufficiency standard, enumerated in *Jackson v. Virginia*, is
> > applicable in determining whether the evidence is the
> > sufficient to uphold each element of the offense. *Brooks v.
> > State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The
> > claim regarding the factual sufficiency of the evidence will
> > therefore be dismissed because it is not cognizable in this §
> > 2254 proceeding.

*Fisher v. Stephens*, No. 3:13-cv-3451-K, 2015 WL 1333226, at *5-*6 (N.D. Tex. Mar. 23,

2015) (quoting *Bogany v. Stephens*, Civ. A. No. H-13-2857, 2014 WL 4537786, at *14

(S.D. Tex. Sept. 11, 2014); citing *Malone v. Stephens*, No. 4:13-cv-718-O, 2015 WL

408045, at *17 n.6 (N.D. Tex. Jan. 30, 2015)), *C.O.A. denied*, No. 15-10350 (5th Cir.

Jan. 7, 2016).

      As to Osei's claim that the evidence was legally insufficient to support his

aggravated assault convictions, a federal court may not disturb a state criminal

conviction on legal insufficiency grounds unless no rational trier of fact could have

found the elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *see also Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 319; *Gibson*, 947 F.2d at 781. This standard of review applies in both direct and circumstantial evidence cases. *See Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990). And federal courts are bound by state statutes and case law in determining the elements of an offense. *See Foy v. Donnelly*, 959 F.2d 1307, 1314 (5th Cir. 1992).

This Court must examine the Dallas Court of Appeals's decision as the last reasoned opinion issued as to legal sufficiency. *Cf. Leachman v. Stephens*, 581 F. App'x 390, 395 (5th Cir. 2014) ("a state habeas decision [ ] found that the petitioner's argument[ ] has been 'previously considered and rejected' on direct appeal[, and] ... 'in light of that determination' [this Court should] 'examine the last clear state court decision of any substance'" (quoting *Divers v. Cain*, 698 F.3d 211, 216 (5th Cir. 2012))).

That decision first noted that "[a] person commits aggravated assault if the person intentionally or knowingly threatens another with imminent bodily injury and uses or exhibits a deadly weapon during the commission of the assault" and that such an "offense is a first degree felony if the offense is committed against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty." *Osei*, 2005 WL 928408, at *1 (citing TEX. PENAL CODE ANN. §§ 22.02(a)(2), (b)(2), 22.01). The state court of appeals then recited the following evidence before concluding that "the evidence is legally and factually sufficient to support [Osei's] convictions for aggravated assault on two public servants," *id*. at *3:

Dallas police officers Darian Loera and Jacob White, dressed in full police uniforms and driving a marked police squad car, were patrolling the area when they observed two men leaving Diamond J's. Loera observed one of the men attempting to conceal a shotgun. White immediately stopped the car and Loera exited the vehicle, pointed his gun at them and ordered them to stop. When they refused, Loera pursued them on foot, yelling "stop, I'm police ." As Loera approached the corner of the convenience store, he saw Osei walk out of the store. Osei began running when he saw the police. Loera turned to pursue Osei, yelling "stop, police, get on the ground." Osei kept running. As Loera chased Osei, White attempted to cut him off with the police car. Both officers testified that as Osei was running, he turned, raised his arm, pointed his hand at them and that they saw muzzle fire and heard a gunshot. They estimated the muzzle fire was about shoulder level, between four and five feet off the ground. Both officers testified the gun was not accidentally discharged. White immediately placed a call for officer assistance. Neither White nor Loera saw the gun or saw Osei throw it down. Loera and White, joined by other officers, continued to chase Osei until he was apprehended and arrested on the lawn of a nearby church.

Also during this time, Rodney Allen was sitting in his car in the church parking lot listening to music when he saw a police car go by. Allen decided to leave and drove in the same direction as the police. When he saw the police car stop at Diamond J's and an officer jump out and start running toward the store, Allen also stopped and watched. He saw an officer chasing somebody and then saw the officer change directions and start chasing someone else, yelling "stop." But the man did not stop and the officer chased him in the direction of Allen's car. Allen saw the man make a "little spin move" like he was checking to see if someone was behind him. When this man made the spin move, Allen saw "fire" and heard a gunshot. Allen heard the officer holler "he's shooting at me." Allen did not know if the man had dropped the gun, threw the gun or whether it just "went off" but he saw "light in the air, three or four feet." Allen later saw this same man arrested at a nearby church but was unable to identify Osei as that man. Allen testified that he had no problem identifying Loera and White as police officers.

After Osei's arrest, a 9mm semiautomatic pistol and shell casing were found near the area where the officers and Allen testified that Osei fired the gun. Forensics testing on the gun and casing determined the casing was fired from this gun. No usable fingerprints could be lifted from the gun because of the rain, but Jamie testified that this gun was the same gun that Osei carried that night. Forensics conducted a trigger pressure

test and determined that between 9.24 and 10.029 pounds of pressure were required to pull the trigger. Forensics also conducted a drop test from different heights and determined that nothing caused the gun to discharge except pulling the trigger.

*Id.* at *2-*3.

Considering this thorough analysis, this Court should not find unreasonable the state-court determination that the evidence was legally sufficient to support the aggravated assault convictions.

Osei's sufficiency-of-the-evidence claims should therefore be denied.

Ineffective-assistance-of-counsel ("IAC") claims

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a] claim that appellate counsel was ineffective ... is that enunciated in *Strickland*" (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986))).

Under *Strickland*, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness. *See* 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See id.* at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

> [B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover,"[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 562 U.S. at 110. "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorney's the benefit of the doubt, ... but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted).

To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus,

"the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated ineffective-assistance claims on the merits, this Court must review a habeas petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011). In such cases, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101; *see also id.* at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal quotation marks and citations omitted)).

In other words, AEDPA does not permit a *de novo* review of state counsel's conduct in these claims under *Strickland. See id.* at 101-02. Instead, on federal habeas review of a claim that was fully adjudicated in state court, the state court's determination is granted "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101; *see also Woods v. Etherton*, 578 U.S. ____, 136 S. Ct. 1149, 1151 (2016) (per curiam) (explaining that federal habeas review of ineffective-assistance-of-counsel claims is "doubly deferential" "because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment'"; therefore, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt'" (quoting *Burt*, 134 S. Ct. at 17, 13)).

Broken down, Osei contends that, as to his aggravated assault convictions, he was denied constitutionally-effective assistance of counsel because (1) counsel gave erroneous advice concerning the use of Osei's prior offenses should he choose to testify; (b) counsel did not investigate and seek an expert witness to show that Osei did not fire the gun intentionally; (c) counsel did not object to the prosecution's use of improper comments; and (d) counsel did not question the venire panel to determine whether the panel could be fair and impartial after they were informed that "the officers got shot at."

In issuing identical findings of fact and conclusions of law issued separately as to each aggravated assault conviction, *see* Dkt. No. 25-1 at 3-9, 11-17, the state court obtained an affidavit from Osei's trial counsel, who the court found to be a "trustworthy

individual" whose "statement is worthy of belief." *id.* at 12; *cf. Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999))). The court then relied on counsel's testimony to recommend that the Sixth Amendment claims be rejected:

> The Court finds that Applicant has failed to prove he received ineffective assistance of trial counsel. Trial counsel, George R. Conkey, responded to the allegations in his affidavit as follows:
>
> That trial counsel failed to object to the State's comment on his failure to testify. Mr. Conkey stated the Applicant's comment that the prosecutor "could not tell you" about certain evidence implies no reference to Mr. Osei's failure to testify and thus no objection was made.
>
> That trial counsel failed to investigate the State's evidence and hire an expert to refute the State's case. Mr. Conkey stated he thoroughly investigated the facts and saw no need to hire an expert to decide if the gtin was accidently discharged. Three witnesses testified that the gun discharged in Mr. Osei's hand from a height of 3 to 4 feet above the ground. A forensic expert could not aid in determining if the gun was discharged when dropped because the evidence indicated it discharged before it dropped.
>
> That trial counsel conducted improper voir dire by not objecting to the State inferring that "the police got shot at." Mr. Conkey stated that this fact is an essential part of the indictment which is normally read to the jury during voir dire so no objection is necessary or required.
>
> That trial counsel advised Applicant not to testify at the guilt/innocence phase of trial and failed to prevent the State from using prior convictions against him so that he could freely testify. Mr. Conkey stated he recalled researching this point and discussing it with Mr. Osei with the result that if he did testify the State would be able to introduce into evidence any prior extraneous acts or convictions and would most likely succeed in getting into evidence. Mr. Conkey stated to Osei that as a trial strategy with the long list of extraneous offenses provided to him by the State, that it would be to his advantage not to testify due to these offenses and also due to the fact that he would be subjected to extensive cross examination by the State which normally is not favorable to the defense.

Dkt. No. 25-1 at 13-14.

In light of this testimony, the undersigned cannot find that the state court's determinations that these allegations of constitutionally-ineffective assistance should be denied amounts "to an unreasonable application of *Strickland* or an unreasonable determination of the evidence." *Garza v. Stephens*, 738 F.3d 669, 680 (5th Cir. 2013) (citing 28 U.S.C. § 2254(d)(1)-(2)); *see, e.g., Feldman*, 695 F.3d at 378; *Cotton*, 343 F.3d at 752-53; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).

As to the aggravated robbery conviction, Osei alleges that he was denied constitutionally-effective assistance because (1) counsel did not object to improper comments by the prosecution during opening and closing arguments; (2) counsel did not object to improper comments by the trial court during voir dire; (3) counsel did not interview Jamie Reynolds; and (4) counsel pursued a defective defense.

Again, the trial court obtained Osei's trial counsel's affidavit as a basis to frame, and then reject, Osei's Sixth Amendment claims.

As applicable to the IAC claims Osei again presents in his federal habeas application, the state court made the following findings:

> Applicant alleged that trial counsel failed to object to improper jury argument. Ms. Donnelly stated that she did not object to the State's jury argument because the State may argue what they intend to prove and that any prosecutor may suinmarize and draw conclusions. She did not find anything objectionable.
>
> Applicant alleged that trial counsel failed to object to an improper

comment made by the judge during voir dire. Applicant asserts ihat the trial judge's referral to the complainant as the "victim" contaminated the entire jury panel. Ms. Donnelly stated that the Applicant presents a partial statement made by the judge during voir dire. Ms. Donnelly states that since no evidence had been offered at that stage of the trial, the Judge cannot be deemed as commenting on the weight of the evidence. Therefore, the statement by the Judge did not contaminate the jury and would not have called for an objection.

Applicant alleged that trial counsel failed to investigate the State's evidence and properly prepare for trial. Ms. Donnelly stated that during her 23 years as a legal practitioner, it was her practice to thoroughly prepare for trial by investigating the facts of a case, research applicable laws of the case, locate and interview witnesses, develop a theory of the case, plan a strategy, file appropriate motions and vigorously defend her clients. Ms. Donnelly investigated this case and prepared for Applicant's trial.

Dkt. No. 25-1 at 20-21.

Considering counsel's testimony, the undersigned finds that these determinations, that the Sixth Amendment claims should be denied, are also "not unreasonable in light of the evidence, or in light of clearly established federal law." *Vollmer v. Davis*, ___ F. App'x ____, No. 14-10301, 2016 WL 7403061, at *1 (5th Cir. Dec. 20, 2016) (per curiam).

Osei's IAC claims should therefore be denied.

## Recommendation

The Court should deny the applications for writs of habeas corpus.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72(b).

-21-

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

      DATED: December 30, 2016

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE